# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH ROTH, | ) | CASE NO. 5:13CV330 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| WEST SALEM POLICE DEPARTMENT, | ) | |
| et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is defendant's motion for summary judgment (Doc. No. 26),[1]

plaintiff's memorandum in opposition (Doc. No. 30), and defendant's reply (Doc. No. 31). For

the reasons set forth below, defendant's motion is **GRANTED**.

## I. FACTUAL BACKGROUND

Plaintiff, Kenneth Roth ("Roth" or "plaintiff"), filed this action on February 14,

2013. (Doc. No. 1.) On March 18, 2013, he amended his complaint. (Doc. No. 6.) He alleges that

his former employer, defendant Village of West Salem ("defendant" or "the Village"),[2]

---

[1] Deposition transcripts and excerpts were also separately filed in support. (Doc. Nos. 27, 28.)

[2] The original complaint named the West Salem Police Department as the sole defendant; however, when the amended complaint was filed, it substituted the Village of West Salem. Both the Village and the Police Department are still listed on the docket as defendants. Since the West Salem Police Department is not *sui juris*, the only proper defendant is the Village of West Salem. *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("the Police Department is not an entity which may be sued"); *see also Elkins v. Summit Cnty., Ohio*, No. 5:05-cv-3004, 2008 WL 622038, at *6 (N.D. Ohio Mar. 5, 2008) ("[a]dministrative units of a local government, such as a municipal police department, are not *sui juris* because they lack the power to sue, and cannot be sued absent positive statutory authority," which has not been granted in Ohio). Moreover, the amended complaint named as a defendant only the Village of West Salem, omitting the West Salem Police Department. Once filed, an amended complaint supersedes the initial complaint. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) (noting that the amended complaint supersedes all previous complaints and controls the case from that point forward) (citation omitted). Because the amended complaint is the only "legally operative complaint" in this case, the Village of West Salem is the only proper defendant. *Id.* The Clerk is therefore directed to administratively terminate the West Salem Police Department as a party.

perceived him as disabled and, therefore, removed him from active duty with the West Salem Police Department, in violation of the Ohio Civil Rights Act, Ohio Rev. Code Chapter 4112 ("OCRA"). He further alleges that defendant failed to promote him upon his return to employment following active duty in the military, and ultimately terminated him, in violation of the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et. seq.* ("USERRA"). The two-count complaint is based on the following facts.

Roth began his employment as an officer in the Village's police department in February 2001. The customary probationary period for his position was six months, but his probation was extended another six months due to his failure to follow an order of his supervisor, the former Chief of Police, Terry Johns. (Roth Dep. [Doc. No. 25] at 129-30.) Except for a period before Roth attended the police academy, when he was a non-commissioned auxiliary officer, Roth was always a part-time officer with the Village. (*Id.* at 132.) (Until he resigned in November, 2009, he was employed full-time for a security contractor at NASA Glenn Research Center.) (*Id.* at 118, 132.)

During his employment with defendant, Roth was also a member of the United States Marine Corps, serving in the Reserves. He was deployed to active duty in Iraq on two occasions. His first tour of duty was from February through September 2005; his second tour was from May 2008 through June 2009. (*Id.* at 119-20.)[3]

After his first tour of duty, Roth returned to the Village's employ as a part-time police officer, and was continuously employed in that capacity until the summer of 2007, when he took a voluntary leave of absence to deal with his divorce. (*Id.* at 162-63.)

---

[3] Roth entered the Marine Corps directly out of high school and served "a four-year contract" from 1994 to 1998, stationed at Camp Lejeune, North Carolina. (Roth Dep. at 114-15.) He later "returned to duty in the Reserves[.]" (*Id.* at 119.) The record does not show exactly when that occurred; however, it would have been some time before February 2005, when he was first deployed to Iraq. (*Id.*)

2

Following the leave of absence, Roth returned to work on September 20, 2007 and, despite being scheduled to work only five hours, he worked eight and a half hours that day. (*Id.* at 158.) The next day, he received a written caution from Police Chief Donald Sims that, due to budgetary constraints, he was not to work more than his scheduled hours without approval from Captain Ray Leiby or Chief Sims. (*Id.* and Ex. C [Doc. No. 25-1 at 254].) Chief Sims testified that other officers had received similar warnings; in particular, he recalled warning Officer Nathan Nemoni. (Sims Dep. [Doc. No. 27-1] at 336-37.)

In April 2009, Roth returned to the United States from his second military deployment, but had a demobilization period that ended in June 2009. (Roth Dep. at 120.) The events giving rise to this lawsuit arose upon his return to duty following this second deployment. During August 2009, Roth received 40 hours of pay from the Village while he attended a training course. (*Id.* at 167.) He returned to work in September 2009 as a part-time patrol officer. (*Id.*)

After Roth had worked only three shifts, he received a letter from Chief Sims, dated September 26, 2009, outlining "complaints from many of the officers" about his "poor attitude[,]" his "aggressive demeanor to [the] civilian secretary, as well as complaints that she does not feel safe at work when [he is] around[,]" complaints from officers that Roth was "at times rude to them and insubordinate to the orders of administration," that he "more or less think[s] [he] can do as [he] please[s,]" and that officers "do not feel safe" around him and "are fearful that [he] will continue to get worse if something is not done." (Roth Dep. Ex. D [Doc. No. 25-1 at 255-57].) The letter recounted a specific complaint from a motorist, received on the second day Roth had been back to work, about having been "stopped . . . for no reason[.]" (*Id.* at

3

256.)[4] Finally, it outlined conversations that Captain Leiby, Roth's supervisor, had had with Roth wherein Roth argued with Leiby and acted "aggressive and angry[,]" and thereafter showed "no change in . . . demeanor or attitude[.]" (*Id.*) The letter ultimately stated:

> In conclusion, due to the complaints, I am compelled to do what I think is best for the Village of West Salem. It is my duty to protect the workers and citizens of West Salem from an angry police officer. It is my decision that you will remain a part of the West Salem Police Department, although you will not be scheduled to work the street as a patrolman until such time as you are able to complete an anger management class and obtain a psychological exam by a doctor qualified to perform such examinations on police officers to determine your suitability to work in the field of law enforcement. Upon successful completion, you will meet with me and the Mayor. You may be asked to ride a few shifts to be reintroduced to representing the Village of West Salem as a patrolman.

(*Id.* at 257.)

After September 26, 2009, Roth did not receive any anger management counseling until December 4, 2009, when he began therapy at the Veterans Administration. (Roth Dep. at 179-81.) He completed the therapy on May 25, 2010, and supplied a certificate of completion to the Village. (*Id.* at 198, 199-200.)

On October 6, 2010, Chief Sims wrote to Roth to inform him that he had contacted Dr. John Jorden to conduct the required psychological evaluation. (*Id.* Ex. G [Doc. No. 25-1 at 281].) Roth actually picked up the letter at the police department because it had been

---

[4] During his deposition, Chief Sims explained the citizen's complaint about the traffic stop as follows:

> But not only did he stop them, he stopped them, how [can] I explain it, as a military style. And by that I mean, that the car is traveling down the road, and as it came up to a stop sign—this is how it was explained to me. As it came up to a stop sign, Mr. Roth didn't do the traditional car stop as you might know, where the police are behind you and they turn on the lights and you pull off to the side of the road, he pulled in front of the car and blocked its movement before he made contact with the driver.

> And the driver indicated, during the conversation that I had with him, that he received no citation, and the only thing that he had done was drive into West Salem and drive around the block.

(Sims Dep. at 340.)

4

delivered to an incorrect address. (*Id.* at 201-02.) Roth underwent the testing and, around

Christmas 2010, he received a copy of Dr. Jorden's report to Chief Sims. (*Id.* at 223.)  Among

Dr. Jorden's "clinical observations" were the following:

> Ken is an emotionally hurting man. . . . Temper and control issues are present.
> There were no indicators of mental illness.
>
> * * *
>
> In the clinical interview he admitted that he no longer wants to work with the
> current situation at West Salem. He also shows signs of unresolved grief and
> PTSD. . . .
>
> * * *
>
> . . . He denied suicidal ideation, but did admit he has down days. . . .
>
> * * *
>
> I told him that I would not be able to say that he is able to return to the force. I
> stated that he has too many issues – the break up with his girlfriend; his troubles
> with his ex-wife; his having been with "48 brothers" killed in the war; and
> survivor's guilt.
>
> Ken is guided by his logical self, but is having to manage a host of emotional
> issues which prohibit his being an officer at this time.
>
> I cannot approve his return to active duty with The West Salem Police
> Department.
>
> All psychological evaluations are a window into where the individual is at the
> time of the evaluation. People and situations change.

(Roth Dep. Ex. H [Doc. No. 25-1 at 283-84].)

By letter dated February 8, 2011, which also attached a copy of Dr. Jorden's

report, Chief Sims inquired about Roth's intentions with respect to returning to work, stating:

> If [Dr. Jorden] is correct in his conclusion that you do not wish to return to work
> with our department, I will appreciate your providing me with confirmation of
> that fact. If Dr. Jorden is in error, however, and it is your desire to return to
> service with the West Salem Police Department at such time and under such
> conditions as will permit your return to active duty, please advise me of this fact
> without delay so that we may arrange to discuss your desires and intentions in the

context of the psychological conclusions and recommendations contained in the doctor's report.

(*Id.* at 282.) Roth admits that, after receiving this letter from Chief Sims, he did not respond because he was engaged in finals and "had a bunch going on." (*Id.* at 225-26.) By letter dated March 9, 2011, the Chief wrote to Roth again, pointing out that his non-response to the February 8th letter had been construed "as a resignation," which would be reported to the Ohio Peace Officer Training Commission on March 22, 2011. (*Id.* Ex. I [Doc. No. 25-1 at 285].) Although he had until March 22, 2011 to correct any misperception that he had resigned, Roth did not do so. (*Id.* at 227.)[5] At his deposition, Chief Sims testified that, had Roth contacted him after the February 8th letter to indicate that he wanted to return to work, he would have allowed him to return "because at that point in time he [Roth] had concluded the two requests that I had made of him." (Sims Dep. at 386.)[6]

After hearing nothing from Roth, on March 22, 2011, Sims submitted a notice of Roth's termination to the Ohio Peace Officer Training Commission. (*See* Doc. No. 28-3 at 481.) In all, Roth had been employed by West Salem for slightly over ten (10) years, from February 2001 to March 2011.

## II. DISCUSSION

### A.    Standard of Review

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[5] Both letters had been mailed to Roth's address of record in Cleveland; but he had already moved to Columbus and was having his mailed forwarded there. (Roth Dep. at 225, 227.)

[6] Obviously, from the text of the letter, any "return to work" would have had conditions attached.

6

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106  S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n., Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on

7

which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**B.    Analysis**

**1.    Count Two – Federal Claim Under USERRA**

The amended complaint does not identify which statutory section plaintiff is suing under, merely asserting a "violation of USERRA." (Compl. ¶¶ 28, 29.) USERRA is the acronym for the Uniformed Services Employment and Reemployment Rights Act of 1994. It is codified at 38 U.S.C. §§ 4301-4335. Based on plaintiff's assertions of a "failure to promote" (Compl. ¶ 28), and ultimate "termination" (*Id.* ¶ 29), the Court concludes that the following section of the statute is relevant:[7]

> **§ 4311. Discrimination against persons who serve in the uniformed services and acts of reprisal prohibited**
>
> (a) A person who is a member of . . . a uniformed service shall not be denied initial employment, reemployment, *retention in employment, promotion,* or any benefit of employment by an employer on the basis of that membership . . . .

---

[7] Defendant makes an argument that plaintiff fails to state a claim under § 4312, which provides the reemployment rights of persons who serve in the military. (Motion at 299-301.) The Court need not consider this argument because plaintiff has not alleged that defendant failed to reemploy him upon his return from either of his deployments.

* * *

(c) An employer shall be considered to have engaged in actions prohibited—

　　(1) under subsection (a), if the person's membership . . . in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . [.]

* * *

(emphasis added).

　　Proving a claim under USERRA is similar to the burden-shifting method of proof in a Title VII case. The individual bringing the § 4311 claims "has the initial burden of proving a prima facie case of discrimination by showing, by a preponderance of the evidence, that his protected [military] status was a substantial or motivating factor in the adverse employment action(s)." *Petty v. Metro. Gov't of Nashville-Davidson Cnty.*, 538 F.3d 431, 446 (6th Cir. 2008). If plaintiff succeeds, "[t]he burden then shifts to the employer to prove the affirmative defense that the employment action(s) would have been taken in the absence of the employee's protected [military] status." *Id.* (citations omitted).

　　For military service to have been "'[a] motivating factor does not mean that it had to be the sole cause of the employment action. Instead, it is one of the factors that a truthful employer would list if asked for the reasons for its decision.'" *Id.* (quoting *Coffman v. Chugach Support Servs.,* 411 F.3d 1231, 1238 (11th Cir. 2005)). "'[M]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration.'" *Id.* (quoting *Coffman*, 411 F.3d at 1238). "'[B]ecause USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly

9

construed in favor of its military beneficiaries.'" *Id.* (quoting *Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299, 303 (4th Cir. 2006) (additional citation omitted)).

        *a.*     **Failure to Promote**

        Plaintiff asserts that, "during the time [he] was deployed, [d]efendant implemented a promotion which [p]laintiff would have been eligible for had he not been deployed." (Compl. ¶ 13.) Further, he alleges that "[w]hen [he] returned from his deployment, he did not receive the benefit of the promotion which he would have received had he not been deployed." (*Id.* ¶ 14.) Plaintiff's specific complaint relates to the promotion of Dozier Hendershot to the position of sergeant, a full-time position. (Roth Dep. at 172-73.) By the time plaintiff returned from his second tour of duty, Hendershot had held the sergeant's position for over a year. (*Id.* at 173.) Plaintiff alleges that, when he complained to Captain Leiby about his lack of promotion, Leiby told him: "It is what it is. Get over it." (*Id.*) He also asserts that Leiby made a statement that "[c]ombat veterans probably shouldn't be promoted anyway because they don't understand, because it's a different world between the military and law enforcement." (*Id.*).

        Despite his assertions, plaintiff points to no evidence in the record that he would have been "eligible" for the sergeant's position and that he "would have received [it] had he not been deployed." In his opposition brief, he argues only that "there was no interview or testing process associated with [the] promotion[]." (Opp. at 495.) But, he offers no evidence that eligibility for, and the decision regarding, a promotion was anything other than a matter left to the discretion of the police chief.

        In fact, plaintiff, Hendershot, and two others were the top candidates for the sergeant's position. (Sims Dep. at 350.) Chief Sims testified to the reasons why he chose Hendershot, and none of the reasons had anything to do with Roth's military service. Sims

admitted that he conducted no interviews because both he and Captain Leiby, whom he consulted with respect to the promotion, "had working knowledge of all [four] individuals, so [they] didn't really feel it necessary to have interviews with them." (*Id.* at 350.) He chose Hendershot over the others because

> his job performance at the time was good. We thought that he worked well with Capt. Leiby and myself. We had had no complaints from the citizens about his handling of calls or anything like that. He didn't have any disciplinary actions in his file. Just his overall performance. His reports were good. We had no complaints at all about Hendershot or anything that he was doing.

(*Id.* at 350-51.) When questioned further about why he thought Hendershot was a superior candidate over Roth, Sims explained:

> Well, I guess as I explained, we had talked about how well he [Hendershot] worked with his standing orders. He didn't really question his – our authority, his orders.
>
> With Roth, that could have been an issue from time to time. Sometimes if he didn't agree with what you were asking him to do, he might give you his opinion about why it should be different. He had been written up before about his actions and his abilities to cooperate there in West Salem from the previous police chief.
>
> So, you know, I was in complete understanding of about if I was dealing with the same person as the previous guy, that it wasn't just him or it wasn't just me and the way I chose to lead, it was the way Ken Roth was, his personality. I felt that although he was okay to patrol before his deployments and whatnot, I didn't feel that his cooperation level with myself and Capt. Leiby and our orders were exactly where I thought they should be as a supervisor.

(*Id.* at 351-52.) In discussing why Sergeant Hendershot was eventually made a full-time sergeant, Sims noted that he was the only officer on the West Salem force who had no other outside job, and Sims perceived that as a mark of loyalty. (*Id.* at 326-27.) In contrast, when not

deployed, Roth was employed full-time for a security contractor at NASA Glenn Research Center,[8] and only worked part-time for West Salem. (Roth Dep. at 118, 132.)

There simply is no evidence in this record that Roth's military service was a motivating factor in Chief Sims's decision to promote Hendershot instead of Roth.

### b.    Termination of Employment

Roth's assertion that his employment with West Salem Police Department was terminated because of discriminatory animus against him on account of his military service also finds no basis in the record.

Defendant asserts that Roth's separation from service was due to his "voluntary abandonment" of his employment. (Motion at 304.)

In opposition, Roth argues that discriminatory animus can be inferred from several factors. (Opp. at 493 [citing *Hance v. Norfolk S. R.R. Co.*, 571 F.3d 511, 518 (6th Cir. 2009)].) First, he points to proximity, asserting that his termination "happened very shortly after he had returned to work." (*Id.*) He also finds "significant inconsistencies between the proffered reasons for the conduct of Chief Sims[ ]" and his own view of the record evidence. In particular, he asserts as "inconsistencies" (1) that neither Tina Barnette, the police department's administrative assistant, nor Hendershot had ever told Sims they felt unsafe around Roth; (2) that the Chief cited him for taking home a radio even though the Chief admitted he had no idea whether Roth was even aware of a newly-enacted policy prohibiting officers from taking radios home; and (3) that the alleged citizen complaint about the traffic stop is supported solely by unverifiable and inadmissible hearsay. (*Id.* at 493-94.)

---

[8] He resigned that position in November of 2009, following a dispute over vacation time. (Roth Dep. at 122.)

Finally, Roth argues that there is even "direct evidence of the employer's expressed hostility towards members of the armed services." (Opp. at 494.) In support, he points to Captain Leiby's alleged statement that military personnel should not be promoted.[9] He also points to the September 26, 2009 letter from Chief Sims, claiming that the letter's mention of Roth's "concern regarding Hendershot's promotion, despite the fact that Roth had made those complaints in the context of the police department having violated his USERRA rights[,]" is direct evidence of animus.[10] (Opp. at 494 [citing Roth Dep. at 172].)[11]

Roth's arguments are unavailing.[12] Even if all of his assertions were taken as true, he cannot overcome these fatal admitted facts: (1) that, despite being asked in the February 8, 2011 letter to advise Chief Sims without delay as to whether he desired to return to work, he failed to contact the Chief; and (2) that, despite being told in a March 9, 2011 letter that, since he had failed to respond, the Chief believed he had resigned and intended to advise the Ohio Peace

---

[9] But the Court notes that Sims, not Leiby, was the ultimate decisionmaker when it came to promotions. Even assuming Leiby did make the statement, as Roth asserts, there is nothing in the record to suggest that Sims was aware of, or in any way influenced by, the statement. Therefore, whether the statement, taken as true, is even relevant is questionable. *See, e.g., Johnson v. Metro. Gov't of Nashville-Davidson Cnty.*, 502 F. App'x 523, 534-35 (6th Cir. 2012) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) ("Statements by nondecisionmakers cannot suffice to satisfy the plaintiff's burden of demonstrating animus.") (additional citation omitted)).

[10] The September 26, 2009 letter states, in relevant part:

> Captain Leiby has informed me that you do not act like he used to know you, and has expressed that he has spoken to you about it. He advised deployments to Iraq and not being promoted here at the police department could possibly be the root of the problem. . . .

(Roth Dep. Ex. D [Doc. No. 25-1 at 256].)

[11] Looking at the cited testimony from Roth's deposition, the Court fails to see how it supports his argument. In his deposition, he testified that he spoke with Leiby about his "[d]isappointment in not being promoted, as well as believing *that the department had violated USSERA* [sic] *in promoting someone without a test or any form of board*, as far as I knew, or had been told." (Roth Dep. at 172, emphasis added.) There is nothing in USERRA that would require a police department to conduct a test prior to a promotion.

[12] Roth's argument that Dr. Jorden's conclusion is contradicted by the conclusion of his own expert, Dr. Richetta, barely requires mention. Dr. Jorden's report, concluding that Roth was psychologically unfit for active duty, was made in December 2010 (*see* Roth Dep. Ex. H), prior to Roth's resignation. Dr. Richetta's evaluation, finding that Roth *was* fit for duty, was conducted on October 10, 2012, nineteen months *after* his resignation. (*See*, Opp. Ex. F., as supplemented by Doc. No. 32.)

Officer Training Commission of that fact on March 22, 2011, Roth still did not contact the Chief to clarify his intentions. The burden on Roth was not great – he only needed to respond to the Chief's letter to avoid being reported as having resigned; yet he admittedly failed to do so. No reasonable jury would conclude that this was anything but a resignation, not a termination in violation of USERRA.[13]  USERRA notwithstanding, an employee cannot simply ignore the overtures of his employer and then claim his employment was terminated.

### c.      *Summary Conclusion – USERRA Claim*

In light of the above, defendant is entitled to summary judgment in its favor on Roth's claim under USERRA, and the same will be granted.

### 2.      Count One – State Law Discrimination Claim

Roth alleges in his complaint that defendant's "unilateral decision to remove [him] from active duty with the Department was based on [d]efendant perceiving [p]laintiff as having a disability[.]" (Compl. ¶ 24.) He alleges that he "was removed from active duty and effectively terminated in violation of the OCRA." (*Id.* ¶ 25.)

Ohio Rev. Code § 4112.02 provides, in relevant part, that it is "an unlawful discriminatory practice: (A) [f]or any employer, because of the . . . disability, . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or

---

[13] Roth's assertion that defendant "clearly demonstrated that [it] had no intention of bringing [him] back to work[,]" (Opp. at 494), finds no support in the record. Sims, in fact, testified that, had Roth indicated a desire and intention to return, he would have permitted it. The February 8, 2011 letter stated as much, although with conditions: "If . . . it is your desire to return to service with the West Salem Police Department at such time and under such conditions as will permit your return to active duty, please advise me of this fact without delay so that we may arrange to discuss your desires and intentions in the context of the psychological conclusions and recommendations contained in the doctor's report." (Roth Dep. Ex. H.) It may be that Roth did not agree with the suggestion that the Chief intended to be cautious with respect to his return to duty; but that does not translate into an intent not to bring him back.

indirectly related to employment." Under the statute, a "disability" includes "being regarded as having a physical or mental impairment." Ohio Rev. Code § 4112.01(A)(13).

"A prima facie case for perceived disability discrimination required [plaintiff] to establish that: (1) [his employer] perceived [him] as disabled; (2) [his employer] took adverse employment action in part because of the perceived disability; and (3) [he] could safely and substantially perform the essential functions of the job, despite his perceived disability." *Dalton v. Ohio Dep't of Rehab & Corr.*, No. 13AP-827, 2014 WL 2809275, at *8 (Ohio Ct. App. June 19, 2014) (citations omitted); *see also Columbus Civ. Serv. Comm. v. McGlone,* 82 Ohio St.3d 569, 697 N.E.2d 204 (1998).

It is well-established that fitness for duty examinations are not adverse employment actions in the context of civil rights statutes. *See Harrison v. City of Akron*, 43 F. App'x 903, 905 (6th Cir. 2002) ("Psychological examinations and internal investigations are not adverse actions.") (citation omitted); *Bennett v. Roadway Express, Inc.*, No. 20317, 2001 WL 866261, at *8 (Ohio Ct. App. Aug. 1, 2001) ("an employer's requirement that an employee submit to a psychiatric evaluation to determine whether the employee could continue to fulfill the essential functions of the position is not tantamount to a perception by the employer that the employee is disabled") (citing *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810-11 (6th Cir. 1999)).

Accordingly, defendant is entitled to summary judgment on this count of the complaint, and the same shall be entered.

### III. CONCLUSION

For the reasons discussed herein, defendant is entitled to summary judgment on all of plaintiff's claims. Accordingly, Doc. No. 26 is **GRANTED** and this case shall be dismissed.


**IT IS SO ORDERED**.


Dated: July 1, 2014

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

16